



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed September 22, 2017

*Mark X. Mullin*

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 15-33611-BJH-13 |
| | § | |
| JOHN HARRISON SCOTT, | § | CHAPTER 13 |
| | § | |
| DEBTOR. | § | |

| | | |
|---|---|---|
| JOHN HARRISON SCOTT, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| v. | § | ADVERSARY NO. 16-3106-BJH |
| | § | |
| NATIONSTAR MORTGAGE, LLC | § | |
| | § | |
| DEFENDANT. | § | |

## **MEMORANDUM OPINION**

On August 3, 2017, the Court held a trial on *Plaintiff's Original Complaint* filed by John Harrison Scott ("***Plaintiff***") against Nationstar Mortgage, LLC ("***Defendant***").  Because Plaintiff's claims are barred by res judicata, and Plaintiff did not prove his claims by a preponderance of the evidence, the Court will enter a separate judgment for Defendant.

## I.    JURISDICTION; VENUE; STATUTORY AND CONSTITUTIONAL AUTHORITY

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334, 151, and 157 and the standing order of reference in this district.  This proceeding is core pursuant to 28 U.S.C. § 157(b)(2)(A), (b)(2)(O).  Venue is proper in this district under 28 U.S.C. § 1409(a).  The Court has statutory and Constitutional authority to enter a final judgment in this matter.  This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law under Bankruptcy Rule 7052 and Federal Civil Rule 52.

## II.    FACTUAL AND PROCEDURAL HISTORY

### A.    Loan history

In 1991, Plaintiff purchased his home in Dallas, Texas (the "***Property***").  In March 2005, Plaintiff and his current non-debtor spouse (together, "***Borrowers***") took out a home equity loan from Lender[1] secured by the Property in the amount of $183,200.00.  The home equity loan is evidenced by a Texas Home Equity Note (the "***Note***") and secured by a Texas Home Equity Security Instrument (the "***Security Instrument***," and together with the Note, the "***Loan Documents***").[2]

---

[1] The term "***Lender***" as defined in the Note and Security Instrument (both as defined below) includes any holder of the Note who is entitled to receive payments under the Note.  The current owner and holder of the Loan Documents is Wells Fargo Bank, National Association, as Trustee for First Franklin Loan Trust, Mortgage Loan Asset-Backed Certificates, Series 2005-FF6.

[2] Def. Ex. 1 (Note and Security Instrument are attachments to Defendant's proof of claim).

2

The Note required Borrowers to make monthly payments of $1,188.23 on the first day of each month beginning May 2005.[3]  If Borrowers failed to pay the full amount of each monthly payment on or within fifteen days of the monthly due date, Borrowers would become obligated to pay a late charge.[4]  Although the Security Instrument permits Lender to accept and hold partial payments received from Borrowers, Lender is not required to apply such partial payments to the Note until Borrowers make sufficient payments to enable Defendant to apply a full monthly payment to the Note.[5]  In addition, the Note requires that payments that Lender accepts *and applies* are to be applied in the following order of priority:  (a) interest due under the Note; (b) principal due under the Note; and (c) amounts due under Section 3 of the Security Instrument concerning escrowed items.[6]  Further, such payments shall be applied to each regular monthly payment in the order in which such monthly payments become due.[7]

Any notices required to be given by Lender to Borrowers under the Note are required to be either delivered to Borrowers or mailed to Borrowers by first class mail at the Property address unless Borrowers give notice to Lender of a different address.[8]  Similarly, the Security Instrument provides that "[a]ny notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by another means."[9]  The notice address under the Security Instrument is the Property address unless Borrowers designate a substitute address by notice to

---

[3] Def. Ex. 1, Note § 3.
[4] Def. Ex. 1, Note § 6.
[5] Def. Ex. 1, Security Instrument § 1.
[6] Def. Ex. 1, Security Instrument § 2.
[7] *Id.*
[8] Def. Ex. 1, Note § 7.
[9] Def. Ex. 1, Security Instrument § 14.

3

Lender.[10]  There is no evidence that Borrowers gave Lender or Defendant a different address for notice purposes under the Loan Documents.

When Defendant began to act as servicer for Lender in December 2013, Borrowers were in default under the Loan Documents because of a prior late payment.

### B.    Escrow issues

Section 3 of the Security Instrument requires Borrowers—unless the requirement is waived in writing by Lender—to pay additional sums to Lender (the "*Escrow Funds*") for payment of, among other things, property taxes and property insurance premiums (the "*Escrow Items*").[11]  If Lender waives the requirement for such Escrow Items, Borrowers are obligated to make such payments directly to the applicable taxing authority or insurance company and to provide proof of payment to Lender.[12]  Lender, however, is entitled to revoke such waiver as to any or all of the Escrow Items at any time by written notice.[13]

#### 1.    Insurance escrow disputes

The Security Instrument requires Borrowers to keep the Property insured against loss.   If Borrowers fail to maintain the required insurance coverage on the Property, the Security Instrument permits Lender to establish an escrow account and to obtain force-placed insurance coverage for the Property, at Borrowers' expense (and such costs constitute additional debt under the Loan Documents).[14]  Plaintiff's principal disputes with Lender and Defendant can be traced to the lapse of insurance coverage on the Property due to Borrowers' failure to pay insurance

---

[10] *Id.*

[11] Def. Ex. 1, Security Instrument § 3.

[12] *Id.*

[13] Def. Ex. 1, Security Instrument §§ 3, 14.

[14] Def. Ex. 1, Security Instrument § 5.

premiums to their insurance company MetLife. Plaintiff's testimony and the documentary evidence demonstrate that Borrowers' insurance on the Property lapsed or was cancelled on at least two occasions between August 2012 and April 2013.[15] Borrowers' failure to maintain insurance on the Property occurred at least a third time on March 26, 2014, when MetLife notified Defendant that insurance coverage on the Property was cancelled due to Borrowers' non-payment of the premium.[16]

As a result of the lapse of insurance coverage on the Property, Defendant mailed a letter on March 29, 2014 to Borrowers at the Property address, notifying Borrowers that (a) Defendant's records indicated Property insurance had expired; (b) Defendant planned to buy force-placed Property insurance at Borrowers' expense; (c) Borrowers were to immediately provide proof of insurance; and (d) if Borrowers did not provide proof of insurance, Defendant would establish an escrow account for the Note and obtain force-placed insurance coverage on the Property and charge the escrow account for the premiums paid by Defendant for such insurance. Finally, Borrowers' monthly payments due on the Note would increase to cover any such Escrow Items.[17]

After Borrowers failed to respond to the March 29 letter, Defendant mailed to Borrowers, at the Property address, a second letter on April 28, 2014 with a final notice to Borrowers to obtain insurance or provide Defendant with proof of insurance, or else Defendant would purchase force-placed insurance on the Property at Borrowers' expense.[18] Borrowers also failed to respond to Defendant's April 28 letter.

---

[15] Pl. Ex. C (State Farm policy 43-R2-5768-6 expired 8/28/2012, and MetLife policy 5354042400 commenced 9/18/2012, indicting a lapse of coverage between the policy terms); (MetLife policy 5354042400 with term from 9/18/2012 to 9/18/2013 was reinstated on 4/13/2013, evidencing another lapse of coverage on the Property).

[16] Def. Ex. 3.

[17] Def. Ex. 4.

[18] Def. Ex. 5.

As a result of Borrowers' failure to respond to either the March 29 letter or the April 28 letter, Defendant obtained force-placed insurance for the Property[19] and notified Plaintiff of the force-placed insurance by a letter dated June 4, 2014 mailed to Borrowers at the Property address.[20] Defendant's June 4 letter states, in part, that "[i]f you do not have an escrow account, one may be established for you and your monthly mortgage payment will be increased to include the cost of this coverage."[21]   In addition, Defendant included a "TEXAS NOTICE OF PLACEMENT OF INSURANCE" with the letter stating, in part, that the insurance premium of $3,073.87 "will be charged to your escrow account.  If you do not have an escrow account, one will be established for you or you will be billed directly for the insurance premium paid by us."[22]  Plaintiff admitted that he received Defendant's June 4 letter.

Plaintiff testified, however, that he did not see either the March 29 letter or the April 28 letter and that he first learned about the force-placed insurance coverage upon receiving the June 4 letter.  According to Plaintiff, when he received the June 4 letter, he contacted his insurance broker to investigate the status of Borrowers' MetLife policy.  According to Plaintiff, his insurance broker allegedly told him that the MetLife policy had *not* actually lapsed, but incredibly, his insurance broker allegedly told Plaintiff to take out a second insurance policy on the Property "to be safe."

Based on the alleged recommendation from the insurance broker to obtain a second property insurance policy on the Property, Borrowers obtained an insurance policy from Kemper

---

[19] Pl. Ex. C, Standard Guaranty Insurance Company policy no. SLS07297084861 effective 2/5/2014.
[20] Def. Ex. 6.
[21] *Id.*
[22] *Id.*

Insurance Company.[23]  When questioned on cross-examination about the MetLife policy, Plaintiff said he asked his insurance broker to look into getting a partial refund from MetLife for having to get a second insurance policy, but Plaintiff further testified that he did not know if such alleged refund was ever received from MetLife.  Plaintiff provided no documentary evidence that Borrowers ever timely paid MetLife, even though Plaintiff did provide documentary evidence that Borrowers timely made payments to Kemper Insurance Company.

Plaintiff's testimony about (a) Borrowers' alleged timely payments to MetLife (without providing any documentary evidence to corroborate Plaintiff's testimony); (b) Borrowers' alleged nonreceipt of Defendant's March 29 and April 28 letters;[24] and (c) Plaintiff's alleged conversations with his insurance broker was not believable or credible and was contradicted by credible documentary evidence.[25]  The direct and credible circumstantial evidence contradicts Plaintiff's testimony and establishes that (a) Borrowers' insurance policy did lapse on at least three separate occasions because of Borrowers' nonpayment of the insurance premiums; and (b) Defendant did mail the March 29 and April 28 letters to Borrowers at the Property address.  In any event, Defendant complied with its obligations under the Loan Documents by mailing those letters to Borrowers at the Property address.

After Borrowers provided Defendant with proof of the new Kemper policy, Defendant gave Borrowers a partial refund for the unused portion of the premium for the force-placed insurance in the amount of $1,954.50, leaving a negative escrow balance due from Borrowers of $2,651.00.[26]

---

[23] Pl. Ex. C, Kemper policy no. DG 439069 effective 6/18/2014.

[24] Plaintiff admitted, however, that he had received several other letters and monthly statements mailed by Defendant to Borrowers at the Property address both before March 29, 2014 and after April 28, 2014.  The Court finds that Plaintiff's testimony that he had not "seen" these two letters was not persuasive or credible.

[25] *See, e.g.,* Def. Exs. 3-5.

[26] *See* Def. Ex. 2 (payment and transaction history:  6/26/2014 entry).

Although Borrowers' monthly Note payment increased due to the Escrow Items, Borrowers continued to make subsequent monthly payments in the original payment amount of $1,188.23, which did not constitute a full monthly payment due on the Note.  As a result of Borrowers' failure to pay the correct increased monthly amounts due on the Note, Defendant—pursuant to its rights under the Loan Documents—did not immediately apply the funds received from Borrowers to the Note, but instead held such funds in suspense until Defendant received sufficient funds from Borrowers to apply a full monthly payment to the Note.[27]  As Borrowers continued to pay only the original monthly payment of $1,188.23, rather than the required increased monthly payment necessitated by the Escrow Items, Borrowers remained in default under the Loan Documents each and every month due to insufficient and late payments.

In May 2015, due to Borrowers' continuing defaulted status under the Loan Documents, and because Borrowers were at least four months past due on the Note, Defendant began the internal process of commencing foreclosure proceedings on the Property.  As part of Defendant's internal foreclosure process, Defendant refunded to Borrowers the balance in their "suspense" account, which totaled $1,294.22 at that time.[28]

On July 1, 2015, Defendant debited Borrowers' escrow account $1,609.00 to reflect the anticipated annual insurance premium that would be owing to Kemper.[29]   Shortly thereafter,

---

[27] *See* Def. Ex. 2 (payment and transaction history:  9/17/2014 entry for suspended payment; 10/15/14 entry showing $1188.23 payment and $541.12 applied from suspense account to underfunded escrow balance; 11/19/14 entry showing $1188.23 payment and $541.12 applied from suspense account to underfunded escrow balance; 12/17/2014 entry showing $1188.23 payment held in suspense; 1/21/2015 entry showing $1188.23 payment held in suspense; 1/22/2015 entry showing application of $541.12 to underfunded escrow balance and payment of $1729.35, the higher monthly payment; 2/18/2015 entry showing payment held in suspense; 2/19/15 entry showing application of $541.12 to underfunded escrow balance and payment of $1729.35, the higher monthly payment; 3/18/2015 entry showing $1188.23 payment held in suspense).

[28] *See* Def. Ex. 2 (payment and transaction history:  5/29/2015 entry).

[29] *See* Def. Ex. 2 (payment and transaction history:  7/1/2015 entry).

however, Defendant reversed the insurance escrow debit of $1,609.00 on August 13, 2015 after apparently being satisfied that Borrowers were paying the insurance premium directly to Kemper.[30]

Shortly thereafter, Defendant made a mistake with the escrow account regarding insurance coverage on the Property. On August 18, 2015, Defendant mistakenly refunded $1,119.37 to Plaintiff[31] after an employee of Defendant erroneously concluded that Plaintiff provided proof of insurance showing that Borrowers had Property insurance coverage in place during the 2014 lapse of coverage on the Property. Instead, the $1,119.37 was, in fact, the earned portion of the force-placed premium caused by Borrowers' nonpayment of the MetLife policy. Although Defendant was entitled to seek a return from Borrowers of the mistaken $1,119.37 refund, Defendant made a business decision to not seek the return of the erroneous refund from Borrowers. Defendant's mistake inured to the benefit of Borrowers. Even though Borrowers benefited from Defendant's mistake, at trial, Plaintiff pointed to this refund as some type of admission that Defendant never should have established the escrow account. The uncontroverted evidence, however, established that Defendant had the right and authority to establish the escrow account and that Defendant's mistake inured to Borrowers' benefit.

Again, in anticipation of the Property foreclosure sale scheduled for September 1, 2015, on August 26, 2015, Defendant refunded the balance of the Escrow Funds in the amount of $632.85 to Borrowers. Plaintiff testified that he did not realize the escrow account was being closed until he received the $632.85 check from Defendant. On cross-examination, however, Plaintiff admitted that he received a notification from Defendant on August 21, 2015 that Defendant was

---

[30] *See* Def. Ex. 2 (payment and transaction history: 8/13/2015 entry).
[31] *See* Def. Ex. 2 (payment and transaction history: 8/18/2015 entry).

removing the escrow collection from Borrowers' monthly payment obligation.[32] That communication preceded the August 26, 2015 escrow refund check, which Borrowers received a few days later. Again, Plaintiff's testimony that he did not realize the escrow account was being closed was inconsistent and contrary to the documentary evidence, which calls into question the reliability and credibility of Plaintiff's testimony.

From the time the escrow account was established in June 2014 until the bankruptcy filing (and even since then), Plaintiff testified that he repeatedly called and sent emails and web based communications to Defendant to inquire why the escrow was established. According to Plaintiff, Defendant either did not respond to such requests or responded only by saying it was investigating the matter. Plaintiff's testimony on this point was not persuasive. Plaintiff produced no written records of his alleged web based or email communications with Defendant, except one email dated July 29, 2015. Contrary to Plaintiff's assertion, Defendant clearly responded to Plaintiff's July 29, 2015 email on August 21, 2015.[33] The Court finds Plaintiff's testimony concerning Defendant's alleged failure to respond timely to Plaintiff's alleged inquiries was not persuasive and Plaintiff produced no other credible evidence to support his testimony.

Plaintiff also testified that he was confused by communications he had received from Defendant. For example, because the "Payment due" amounts in letters sent by Defendant to Borrowers did not match the "Regular Monthly Payment" amounts contained in Defendant's regular monthly mortgage statements, Plaintiff testified that he did not know what amounts

---

[32] Pl. Ex. E.

[33] Pl. Ex. E. Plaintiff produced only Defendant's response and not Plaintiff's original communication, so it is unclear whether Plaintiff was inquiring about the May 2014 escrow for force-placed insurance, or the July 2015 escrow for insurance.

Borrowers should pay on the Note each month.[34] Plaintiff also testified that he was further confused because the "Regular Monthly Payment" in each monthly mortgage statement was not necessarily the current amount due for that month. As a result of such alleged "confusion" Borrowers continued to be in default under the Loan Documents and eventually stopped making any payments prior to the bankruptcy filing. As of the Petition Date, Borrowers were at least seven months in arrears on their payments.

In response to Plaintiff's testimony, Edward Hyne, a litigation resolution analysis for Defendant, testified without contradiction that the letters Defendant sent to Borrowers were required by the Consumer Financial Protection Bureau ("***CFPB***") and reflect the amounts that would have been due had Borrowers been current under the Loan Documents. Defendant cannot be faulted for sending forms required by the CFPB. In addition, the Security Instrument provides that payments accepted and applied by Defendant shall be applied to each Periodic Payment in the order in which they came due,[35] so it is not surprising that the "Regular Monthly Payment" in the mortgage statements (as Mr. Hyne testified) reflects the amount due for the oldest delinquent payment as opposed to the current month of such statements.

At trial Plaintiff also questioned (a) Defendant's entitlement to not apply funds as and when received to the current monthly payment; (b) Defendant's requiring the Escrow Items even after Defendant refunded (mistakenly) the earned premium for force-placed insurance; (c) the sufficiency of Defendant's notifications that it was revoking waivers of the Escrow Items; and (d) the calculations in Defendant's proof of claim (discussed below).

---

[34] *See, e.g.,* Pl. Ex. 1 (5/20/2015 letter reflects "Payment due 04/01/2015: Unpaid balance of $1,563.12," whereas mortgage statement dated 3/18/2015 reflects "Payment Due Date" of 4/1/2015 and a "Regular Monthly Payment" of $1729.35).

[35] Def. Ex. 1, Security Instrument § 2.

11

The Court finds and concludes that (a) Defendant was entitled under the Loan Documents to hold and "suspend" payments received from Borrowers until Defendant received sufficient funds to apply to a full monthly payment due under the Note, with such funds being applied to the oldest delinquent payment; (b) Defendant was entitled to require Borrowers to pay the Escrow Items under the Loan Documents; (c) Defendant gave proper written notice that it would require Borrowers to pay the Escrow Items;[36] and (d) Defendant did nothing improper with respect to its filed proof of claim (as addressed below).

### 2. *Real property tax escrow disputes*

Defendant paid and charged Borrowers for Property taxes assessed, but not owed, in 2014 and 2015. Plaintiff complained at trial about Defendant's escrow for real property taxes because Borrowers had obtained a deferral for the payment of such property taxes from the Dallas Central Appraisal District.[37] But the tax deferral notice itself notified Borrowers that they should contact their mortgage company before filing for the deferral because even if they qualified for such a deferral, the mortgage company may not agree to the deferral of such property taxes and may pay such property taxes to prevent delinquency. In addition, Defendant was entitled under the Loan Documents to include real estate taxes as an Escrow Item irrespective of the Dallas Central Appraisal District deferment approval. The Court finds and concludes that Defendant's actions with respect to the Property tax escrow were appropriate.

---

[36] *See, e.g.,* Def. Exs. 4-6.
[37] Pl. Ex. A.

### C.  Chapter 13 bankruptcy

Plaintiff filed his Chapter 13 petition with this Court on September 1, 2015,[38] preventing Defendant from foreclosing on the Property.  Defendant—on behalf of Lender—filed a proof of claim in the bankruptcy case on November 20, 2015, asserting a secured claim of $166,248.05, including arrearages as of the Petition Date of $14,361.03.  After the Court denied confirmation of Plaintiff's first proposed Chapter 13 plan, Plaintiff filed an amended Chapter 13 plan on December 7, 2015 (the "*Plan*").[39]  The Plan listed arrearages to Defendant in the amount of $9,000 and a total debt of $155,021, and the Plan called for Plaintiff to make direct payments to Defendant.  On January 15, 2016, the Court entered an order (the "*Confirmation Order*") confirming the Plan.[40] The Confirmation Order provided that the Trustee's Recommendation Concerning Claims ("*TRCC*") would be binding on all parties concerning allowance and treatment of claims in the absence of an objection.  On March 18, 2016, the Trustee filed his TRCC,[41] which had a proposed claim amount for Lender of $166,248.05, to be paid directly to Lender by Plaintiff with only the proposed arrearages of $14,361.03 to be paid through the Trustee.  The amounts in the TRCC match the amounts contained in the proof of claim filed by Defendant for Lender.  No party objected to Lender's proposed treatment in the TRCC, and the Court entered an order approving the TRCC on June 9, 2016 (the "*TRCC Order*").[42]  Neither Plaintiff, the non-debtor Borrower, nor any other party filed an objection to Lender's proof of claim.

---

[38] ECF No. 1.  Plaintiff's spouse is not a joint debtor and has not filed for bankruptcy relief.
[39] ECF No. 29.
[40] ECF No. 34.
[41] ECF No. 36.
[42] ECF No. 42.

### D. Adversary proceeding

On July 20, 2016, Plaintiff filed his *Plaintiff's Original Complaint*,[43] asserting claims against Defendant for (a) violations of the Real Estate Settlement Procedures Act; (b) violations of the Truth in Lending Act; (c) violations of the Fair Debt Collection Practices Act; (d) breach of contract; (e) violations of the Texas Debt Collection Act; and (f) abuse of process. In connection with those claims, Plaintiff also requested declaratory relief, injunctive relief, and attorney's fees. Defendant filed its *Answer* on September 6, 2016,[44] and the parties later filed their respective trial briefs and proposed findings of fact and conclusions of law.[45] The Court held a trial on the merits on August 3, 2017.

## III. PRELIMINARY OBSERVATIONS ABOUT THE WITNESSES

Only two witnesses testified at trial. Edward Hyne, a litigation resolution analysis for Defendant, testified about Borrowers' loan history with Defendant and Defendant's actions in servicing Borrowers' loan. Mr. Hyne was a credible and persuasive witness who was very knowledgeable about Borrowers' loan documents, payment history, and the transactions in dispute. Mr. Hyne's testimony was corroborated by the documentary evidence.

Plaintiff testified on his own behalf. Plaintiff initially came across as very credible, but as he testified, his testimony contradicted the documentary evidence on several key issues and ultimately was not credible or persuasive.

The witnesses' respective credibility was critical to the Court in rendering its alternative ruling on the merits.

---

[43] Adv. ECF No. 1.
[44] Adv. ECF No. 8.
[45] Adv. ECF Nos. 20, 22, 26, 27.

## IV.    LEGAL ANALYSIS

### A.    Plaintiff's claims are barred by res judicata

Defendant did not raise the defense of res judicata even though the TRCC Order allowed Defendant's claim without objection or counterclaim by Plaintiff.   There are two limited circumstances in which this Court may raise the res judicata defense sua sponte.  First, res judicata may be raised sua sponte where both actions were brought in courts of the same district.  Second, res judicata may be applied sua sponte when all relevant data and legal records are before the court and the demands of comity, continuity in the law, and essential justice mandate judicial invocation of res judicata.[46]

Both circumstances are present here.  First, Plaintiff's Chapter 13 bankruptcy and this adversary proceeding were filed in this Court.  Second, this Court has before it—either through admitted exhibits or judicial notice—all of the relevant information, and the demands of comity, continuity in the law, and essential justice mandate this Court's invocation of res judicata.

A bankruptcy judgment bars a subsequent suit when (a) both cases involve the same parties; (b) the prior judgment was rendered by a court of competent jurisdiction; (c) the prior decision was a final judgment on the merits; and (d) the same cause of action is at issue in both cases.[47]   "Because of spiraling litigation costs, increasingly congested courts—especially bankruptcy courts—and expanding theories of recovery, such as lender liability, it is more imperative than ever that the doctrine of res judicata be applied with unceasing vigilance."[48]

---

[46] *Carbonell v. Louisiana Dep't of Health & Human Res.*, 772 F.2d 185, 189 (5th Cir. 1985); *Busch v. Robertson*, No. CIV.A. 3:07CV0375-G, 2007 WL 1610129, at *2 (N.D. Tex. June 5, 2007).

[47] *In re Baudoin*, 981 F.2d 736, 740 (5th Cir. 1993).

[48] *Id.*

All four res judicata elements are satisfied here. First, Plaintiff and Defendant are both parties-in-interest in Plaintiff's bankruptcy case, and both parties were given notice of the TRCC. Plaintiff and Defendant likewise are parties in this Adversary Proceeding.

Second, this Court had core jurisdiction to enter the TRCC Order, and both parties agree that the Court has core jurisdiction over Plaintiff's claims against Defendant. This Court is a court of competent jurisdiction as to both matters.

Third, the TRCC Order allowing Defendant's claim is a final judgment for res judicata purposes.[49]

Fourth, the same cause of action is involved in both the TRCC and this Adversary Proceeding. The Court employs the "transactional test" for deciding whether two cases involve the same cause of action for res judicata purposes.[50] The critical issue under that test is whether the two actions are based on the same nucleus of operative facts.[51] The Loan Documents and Defendant's actions taken pursuant to those documents form the basis of Plaintiff's claims against Defendant. Plaintiff's claims against Defendant could have and should have been raised and determined through an objection to Defendant's proof of claim or a counterclaim to that proof of claim. A claim or defense that could have been, but was not, asserted earlier is still the same claim for res judicata purposes.[52]

Because this Court raises res judicata sua sponte, and because all of the elements of res judicata are present, Plaintiff's claims against Defendant are barred.

---

[49] *Id.* at 742.

[50] *Id.* at 743.

[51] *Id.*

[52] *Id.* at 743-44 (res judicata precluded Chapter 7 corporate debtor's lender liability claim when lender's claim was allowed by prior bankruptcy court order).

Case 16-03106-bjh Doc 33 Filed 09/22/17 Entered 09/22/17 16:57:46 Page 17 of 19

**B.    Plaintiff's claims fail on the merits**

Even if res judicata somehow does not bar Plaintiff's claims, they fail on the merits.

### 1.    *Plaintiff's Real Estate Settlement Procedures Act claim fails*

Plaintiff asserts that he is entitled to statutory damages under the Real Estate Settlement Procedures Act in the amount of $2,000 per violation, for each notice of error sent to Defendant regarding proof of insurance that was not researched and corrected.  The Court finds no credible evidence of any notice of error regarding proof of insurance that was not researched and corrected timely by Defendant.  Instead, the Court finds and concludes that Defendant's actions with respect to the force-placed insurance and communications with Plaintiff were fully justified and appropriate.

### 2.    *Plaintiff's Truth in Lending Act claim fails*

Plaintiff asserts that Defendant violated the Truth in Lending Act by failing to respond timely and adequately to Plaintiff's notice of errors regarding Defendant's accounting and collection practices with respect to amounts Defendant was assessing and seeking to collect from Plaintiff both before and after the bankruptcy filing.  The Court finds no credible evidence regarding any notice of error regarding accounting and collection practices that was not researched and corrected timely by Defendant.  Instead, the Court finds and concludes that Defendant's actions before and after the bankruptcy filing were fully justified and appropriate.

### 3.    *Plaintiff's Fair Debt Collection Practices Act claim fails*

Plaintiff asserts that he is entitled to statutory damages under the Fair Debt Collection Practices Act, in the amount of $1,000.00 per violation, for each monthly mortgage statement that was misleading or misrepresented the true amount owed.  The Court finds no credible evidence of any mortgage statement that was misleading or that misrepresented the true amount owed.  The

17

Court finds and concludes instead that each monthly mortgage statement properly reflected the payment due date, the total amount due (including principal, interest, the Escrow Items, and fees and charges), and the amount due for the oldest delinquent payment, as permitted by the Loan Documents.

### 4. *Plaintiff's breach of contract claim fails*

Plaintiff asserts that Defendant breached the Loan Documents by Defendant's misapplication of funds and failure to correct its misapplication, causing the Property to be placed in foreclosure proceedings improperly and destroying Plaintiff's retirement plan to receive a cash payout from a reverse mortgage. The Court finds no credible evidence that Defendant misapplied funds or failed to correct any misapplication. The Court finds instead that Plaintiff breached the Loan Documents by (a) permitting insurance coverage on the Property to lapse for nonpayment; and (b) failing to timely pay the required amounts due under the Loan Documents.

### 5. *Plaintiff's Texas Debt Collection Act claim fails*

Plaintiff asserts that Defendant violated the Texas Debt Collection Act by misrepresenting the character and amount of the mortgage arrears. The Court finds no credible evidence that Defendant misrepresented the character and amount of mortgage arrears.

### 6. *Plaintiff's abuse of process claim fails*

Plaintiff asserts that Defendant abused the bankruptcy process by seeking to receive funds through Plaintiff's confirmed Chapter 13 plan in an amount that Defendant is not entitled to receive because its proof of claim is misleading and contains false information. The Court finds no credible evidence that Defendant abused the bankruptcy process or that Defendant's proof of claim is misleading or contains false information.

### 7.    *The rest of Plaintiff's claims fail*

For all of the reasons outlined above, Plaintiff is not entitled to declaratory relief, injunctive relief, attorney's fees, or any other damages.  To the extent the Court has not already addressed any of Plaintiff's claims for relief, such claims for relief are denied because there is no credible evidence of Plaintiff's entitlement to such relief.

## V.    CONCLUSION

Plaintiff's claims are barred by res judicata because such claims should have been, but were not, raised in connection with the TRCC Order that allowed Defendant's claim.  Even if the Court were to reach the merits of Plaintiff's claims, they fail for the reasons set forth above.  The Court will enter a separate judgment for Defendant.

### # # # END OF MEMORANDUM OPINION # # #